All right, next case on the docket is In re Marriage of Johnson. Clause number 5-14-0479. May it please the court. Julie Johnson appeals a judgment of dissolution of marriage regarding the issue of evaluation and allocation of marital property, the amount of duration of maintenance and the failure of the trial court to award her attorneys. I'd like to start by discussing the allocation and evaluation of the property, particularly including the marital home and the family business, the family financial planning business. The trial court awarded the marital home to the husband, Bernard. He awarded the marital home to Bernard at a value of $181,387. He then gave Bernard a debit for the mortgage on the home of approximately $235,000. The only evidence that the court had before that I could find regarding the value of the marital home was the parties' respective financial affidavits. Wife's financial affidavit indicated the value of the marital home was approximately $160,000. Husband's indicated that the net equity in the marital home was approximately $180,000. Husband's value in the marital home was $417,000. Yet he was awarded it at a value of $181,387. I think it should be pretty clear from looking at the record and everything that that $181,000 was equity. That's right. It was not the total value, all right? So trial court has a duty to make an equitable division of marital assets. Your opponent already used it. Okay, let's plug in the right number, the full value. And then they each get about 50%. So can't we kind of look at that? And I think we all kind of realize what the trial court did here. Yeah, it was kind of a mistake. Well, if it's a mistake, the court on its face awarded Julie 76% of the assets and Bernard 24%. If we apply those percentages to the proper net worth of the parties of $506,000, she would have received $177,000 more. So your argument would be the trial court intended to give her three-fourths of the marital assets. And was there any finding or anything? No. Now, there is an interesting fact in the record, Judge, that I would like to point out. Early on, Julie petitioned the court for interim treaties of costs. Bernard filed a motion to dismiss that, and he alleged in his paragraph 6, he says, Paragraph 6 of that verified petition, Bernard alleged that the parties have acquired significant marital assets and that Julie will likely be awarded more than $750,000 of assets and no debt. And she should be well able to pay her attorney's fees. The total marital estate that the court found was only $500,000. Had he not made this mistake, it would still be less than the $700,000 that Bernard assumed Julie would get. So something went wrong, and part of it was, I believe, the valuation of the marital home. The second thing I think that went wrong was the way the court handled the valuation of the parties' financial planning business. At the time the litigation started, Bernard, he had a financial planning business that he had $44 million under management. During the pendency proceedings of approximately a year and a half, maybe a little less than that, he bought a similar business in Evansville. His main business was in Centraia. He purchased $34,600,000 of assets for $366,225. That would be a heck of a deal if he actually purchased $34 million in assets for $360,000. But this is an arm's length transaction. The key man in that particular deal had died in a cycling accident, and there was no key man. The contract that they have itself had a discount for loss of accounts during the first six months. They reduced the purchase price approximately a fourth, which to me was the way to measure the discount for personal goodwill. And he takes this $34 million of assets under management and adds it to $44 million of assets under management. I thought the 44 also went down. Pardon me, sir? I thought the 44 also went down. The 44 is what he had originally, and it never changed. Oh, I thought it went down. Okay. I don't think there's anything else that indicates that. And, in fact, at trial, Bernard testified that he managed $78 million of assets. I may have had that number wrong, but it's like a million or so, but that's approximately what it was. And so we combine these two, and we value the whole thing, and we award it to Bernard for $192,000. To me, that's contrary to manifest way to the evidence. The trial court made two errors in his analysis. Number one, he didn't give this transaction where assets under management were purchased during the divorce. And second, he didn't pay attention to the gross values of the business before we started discounting it for personal goodwill. You know, and I understand what you're saying, and it does smack as a problem that he pays $360,000 after the discount for less than half of his business, and then the trial court evaluates both of them at less than that. But both sites did present experts' reports, okay? And Mashoff's report is a very comprehensive, multi-page explanation of why he reaches the numbers he reaches. In the report, and I can't remember her name, but the report submitted, and I understand you were not a trial attorney, the report submitted on behalf of your client was a one-page, just numbers, no real explanation. It was a multi-page report. It takes half of the buy-in of one part of the buy-in of the record and another half of the other buy-in. It was a fully detailed report. And she makes the point that, in her report, that we've got to look at that recent transaction when we lay the baseline for that. Because I tried to look for that yesterday before coming today, and I didn't see in the record that report. I'll find it. It's there. Okay. Now, again, I'd like to point out something. Earlier in the litigation, Julie asked for continuance, and Bernard objected to it. And he objected because he says the petitioner's objection to Respondent's motion to continue, paragraph 5, is that the businesses have already had a professional evaluation and have already been exchanged in discovery, and that the recently purchased business has a clear value based on its time of purchase and its market rate. Now, I can't be—I agree 100 percent with that. And the court ignored the present value and the market rate of the newly acquired business. That statement was in the motion for continuance. It was in the objection to Julie's motion on continuance that occurred earlier in the trial. And then Bernard goes in and asks for continuance five days before trial because his experts that he had, FT transactions out of Washington, wouldn't testify. And those values, the gross number—now, I'm not talking about the long discount that this court approved in Alexander Case. I understand that. But the trial court never discussed the gross value. And the gross value that he relied on was much less before the discount than the other three that went before the trial court. The FT transactions that Bernard was intending to use at trial had a gross value of $1.247 million in July of 13. Earlier, in October of 12, it had $1.1 million. And Weiss' expert valued it at $1.49 million. And Metschoff was $785. Is that what it was? The court relied on $785,000. Without discussion of why he picked that number, other than that the discount he liked the way the discount was done. So we think that's why Bernard thought Julie was going to get $750,000 of assets and no debt because he knew the value of his business was considerably more than $192,000, and the value of his house was considerably more than $182,000. If I may, I'd like to discuss the issue of maintenance. In this case, Julie was awarded $2,750 of maintenance for a period of 30 months to 20 years. The issue of maintenance is an abuse of discretion standard. I think the court abused his discretion completely here. We have a 29-year marriage. We have Bernard's financial affidavit that says he's making $17,000-plus a month, a gross of $206,000 a year. He shows on his financial affidavit, which is attached as in the appendix, both of them, shows that Julie's unemployed. He also sets forth in his affidavit his expenses, and he includes taxes and all the expenses you would expect to get down, and he ends up with money available, almost $2,000. In other words, his own financial affidavit, going into trial, showed that his gross income was $2,000 a month, more than his income after expenses. And did he include in those expenses the temporary maintenance? No. Okay. But he did include no in that. Now, so assuming that all of these expenses are accurate and all of these deductions are accurate, he's got $2,000 a month. That includes $1,000 a month for meals outside the home, and it includes $2,000 a month for his youngest son's college education expenses. His youngest son graduated in May of 2013 at the time this decision came out. So Bernardi has $4,000 a month available for paying temporary maintenance according to his own numbers, and that disregards the fact that much of the income that he gets from his business may be used to pay personal expenses. So 29-year marriage, no showing that Julie is employable at any kind of a wage, limited income-producing assets were awarded to her. The total award is $82,000. The total maintenance award to be paid over 29 years. He gets a maintenance deduction for taxes, which brings that award down to something like $60,000. He paid us off in four months. Even Bernard, and the payor of maintenance is never reasonable about the nominal duration of maintenance.  Bernard ends up living in a $470,000 house in the most prestigious neighborhood in Centralia. He's got the business that before we applied the valuation discount, the personal goodwill discount, is worth $750,000. I feel he clearly can sell for that or more, the entire business. He doesn't miss a beat in his life span. Meanwhile, Julie, who is shown in the testimony to have bad health, to be unemployed, to have limited employment opportunities, to have been the primary caregiver for the partner's two children, to have helped the husband grow the business for the years of the marriage. She ends up being almost where she was when she was married at 20 years old. Just saying, I don't care how fast or slow we say it, we say husband has $200,000 a year of income, wife has no income, they've been married 29 years, husband pays maintenance of $60,000, $82,000 total. The next thing I'd like to discuss, does he have a question, Judge? No. Is the issue of attorney's fees. The court blasted Julie's attorney in his analysis of the attorney's fees. Curiously, one of the things he says is that Julie's attorney caused unnecessary delay. Bernard's attorney asked for a continuance five days before trial because he didn't have a business valuation that he thought he could use. Instead of continuing the case, the court says, fine, we're going to take all of the testimony, close the proofs, and give him a chance to come in later with his business valuation, which is exactly what happened here. So Julie was shown to have $32,000 of unpaid attorney's fees. It was $7,000 in evidence. I believe it was UU. And the court awarded none. And then when the court did the allocation, it added as part of her net worth the $5,000 in advanced property settlement she had received early on in the litigation. It added the $3,000 that Bernard was ordered to pay on her expert witness fee and didn't award her any attorney's fees at all. This reduced her net worth, her effective net worth, by another $32,000, actually more if you take the advanced property settlement and the advanced expert witness fee. Going back to the allocation of the property, there was a couple of other issues. Julie was awarded an oil and gas royalty. The court valued it almost $30,000. Bernard's financial evidence showed it generated $2,000 a year of income. Take 15 years at $2,000 a year. Go ahead and finish your part. Go. Acquire that asset. I just think that was not dramatic. Let's wait. Thank you. All right. Thank you, sir. And Mr. Carnine. Good morning, Your Honors. Aaron Carnine for Bernard Johnson Plaintiff. I'll first address the issue of the home. Very quickly, I agree that it looks odd. The court had a value in one column and a debt in another column. My brief acknowledges that. It makes sense to have the entire value of the house. It was about what's owed on it to arrive at an equitable amount. There is nothing mentioned in the court that the court was trying to have a percentage division. So the way that that percentage actually works out, when you correctly keep the value and the cost, the amount owed on the house in the right column is about a 51-49% split. 51-49. Family business is obviously one of the big issues. And this case is a manifest way to the evidence. It's an evidence case. It's a fact-based case. It's based on what the court heard and considered. Both parties agreed, as you had pointed out, to the method of valuation. In the record is a letter from confirmation from the attorneys that says, We will submit these valuations to the judge, and he will decide without cross-examination. Even at that time, we both left it open. If either one of us wanted to follow up or cross-examine, we could have done that. But the business valuations are two different ones that the court could pick. Since this is a fact-based case, the business valuations are beyond what the attorney's capacity could do. They agreed on the method of valuation. The valuation was in the range that was testified to the experts. The court did not split the difference, for example, between the valuations. The court did not inject its own determination of value. There was no failure of proof, no problems with respect to any kind of proof or evidentiary issues within those valuations. No indication of any arbitrary decision by the judge. And this is wording from some of the cases that were referenced in my brief regarding that concept. The concept is, there are two valuations the court specifically said that it read every page of. And Fowler-Mashaw wanted to be more credible. Now, beyond that, with respect to specifics between those two valuations, debt. The valuation of Julie's expert did not consider debt that was owed by the business. I don't know why. Again, it's beyond me. The court will pick from two experts, of which I'm not. But in the valuation from Stone-Carlyle, and for reference, her own valuation at page 10, page 12, there is no element of debt mentioned. I don't know why she didn't consider debt that was owed by the business. You're talking about the debt that your client still owed to purchase the Evans Publicage. Yes. And that was $100,000. That was part of it. Actually, yes. That was part of it. In the Mashaw valuation, he references at tab 2, he mentions a debt of $392,000. So he comes up with a value, then a debt, and then an amount below that, and then adds his goodwill measurement to that. So specific differences, there is no debt mentioned in the Julie's valuation. The debt is significant because it is very close to a third of the total value that Mashaw came up with. His total value, $1,178,000. Debt, $392,000. That's about a third. Now, that's important for various reasons, not only just the valuation of the business, but this is a debt that is to be repaid. It's an amount of money that would come from the business to be repaid, which would then affect cash flow and income and all the rest of it. And that was considered by Mashaw. The maintenance issue is a significant one. Temporary maintenance was ordered early on in this case. That temporary maintenance was $5,500 per month until the final judgment, which resulted in Bernard paying $104,000 temporarily to Julie in temporary maintenance. Not only did he pay that, but he paid the mortgage on the house, which was in the $2,300 range. Essentially, so Julie was able to live in a mortal home during the three-year pendency of the petition and the hearing, received all that maintenance, received a free place to stay. $46,000 was paid to the mortgage of that home while she was there. Now, this is a fact of the case. It was the judge that listened to the evidence that determined what maintenance was being based on, the demeanor of the parties and all of the factors involved in it. Specific reference made to the actual testimony beyond the financial affidavits. Question to Julie, what did you do with that money and what are you going to do with that money? Answer, televandals, tire, mother, shopping, sorting goods, gas, eating out, New Jersey, Las Vegas, Miami. Those are the things that the court heard that Julie was doing with all the money. There was even a phrase in the record where she was asked, what about these other deposits to your checking account? Answer, I don't know what they are. So the court was there to hear those things and made a determination based on that. The court basically found that this was an inflated divorce standard of living, not really a standard of living that existed during the marriage. On its face, this does look like a permanent maintenance case. I mean, it's a 29-year marriage, big disparity in income and so forth. I mean, what was the evidence from which the court would have determined that Mrs. Johnson would be able to become self-supporting in 30 months at a style which she was accustomed to in the marriage to make it rehabilitative maintenance for 30 months? A couple of things. One, the property settlement. The property settlement included apartment buildings, income-producing property. Her property settlement. But then she's reducing her assets. That's correct, and I recognize that. You get an asset that generates an amount of money. Yeah, if you sell that asset, it's not going to generate any money. That's correct. The court also gave her rental properties, lots, and several IRA accounts to the tune of $450,000. So she had a significant amount of money. Some of it would generate even the oil lease. She did basically everything except home and business. The answer to your question, Your Honor, is factors from maintenance, needs of the apartment. A specific example from the hearing is that Julie testified at one point she's now a vegetarian and has to go to Whole Foods and therefore needs more money. She had become a vegetarian a year earlier, which is in the context of the separation during the divorce. That was an example of a need that did not exist during the marriage. Also, that's one of the biggest questions. In my brief, I attached one of my exhibits and one of the court's history of income tax returns. It indicates that the standard of living was certainly not always the one that was in the course of the last year, but it compromised a range of income. I guess what I'm asking about, I'm not asking so much about the amount of maintenance right now anyway. I'm asking about why should it end in 30 months. I mean, was there any evidence that she was going to train for some kind of a job and have some kind of new income somewhere or anything like that? As far as the ending point, I don't have an answer for you and I don't think it's clear from the judgment. But as far as training goes, the judge did say that Julie testified that she wanted to take a Series 7 license to be able to do similar financial matters. The judge said, well, why couldn't you have done that after the petition was filed? You've already had three years in which to do that. So I don't have an answer to your question, Eric, because it wasn't in the judgment. But the maintenance factors is what I have to answer that question. And that was a point. There were testimonies by both parties of hard times over a period of years. There was one element of Bernardine receiving inheritance 10 years ago, but it was $150,000 and it would have set the parties a little ahead at that time. There was an issue of, well, the health of both parties was an issue. The judge found, look, just because you're depressed and in asthma, that doesn't mean that you can't try to better yourself. Bernard himself had hypertension, bulging discs, bulging discs in his back. So there were health issues that the court considered as well. What was her educational background? Associate's degree, I think, was the farthest level of educational background. And, again, the duration of the marriage, it is on the longer side, but the court can assign different weight factors. And another important concept that might help answer that question is the debt assignment. Consider who got what kind of debt and what they're going to have to do with it. Julie's debt assignment from the judgment was $72,000. But of that, $49,000 was attorney's fees. But that wasn't really attorney's fees. It was money that she owed to her mother and sister. So consider the debt that Bernard received. He received the remaining debt on the business, the remaining debt on the marital home, the debts, an IRS debt, an easement on the house assigned to Julie, appraisal costs, debt associated with the business. And in the court's assignment of debt, the court basically says all debt associated with the business, and there's no number there. The number was contemplated in Mashoff's evaluation, which Bernard will have to pay whatever the terms of that debt have to pay. Also not in the court's assignment of debt was Bernard's attorney's fees. Bernard testified at the time of trial he probably owed $20,000. The trial was more than a year ago. So some of the debts aren't considered and recognize what the debts actually are. The court can look with skepticism as to loans between parents. That's the concept with respect to the debt owed to mom and to sister. So imagine this. Is there any contrary evidence to whether or not she would have to repay that debt? Not that I recall. I don't recall even a piece of paper that said here's a loan and that you have to pay it back. I do not recall any of that. Now, that's also important with respect to debts. The concept is important with respect to attorney's fees as well because that $49,000 of debt owed to Julie that Julie purportedly owes is attorney's fees. That debt is not listed in Bernard's list of debt. In a way. Excuse me. Are you saying that there was no proof that it was related to attorney fees or just that she had to repay it? There was no proof that she had to repay it. But there was no question that it was? I do not recall. I don't remember seeing any kind of document that said I loaned you this for attorney's fees. Or that she had that outstanding for attorney fees. Correct. I think I learned that. I was the trial attorney. I learned that the day of the trial. I had no other discovery that would have indicated that it was an obligation to some extent. But in the brief reference cases that say a court can look at suspicions of debts over the appearance. So, question on whether she had to repay her debt. But I think the trial court could consider that among the various factors. Her attorney at trial did submit a detailed billing statement. Is that correct? I think that she did. Which showed a total of like $72,000. It was more than the amount owed to the mother. Yes. I think the attorney at the time was owed. Claimed that she was owed about $30,000. And then the mother had sold. The attorney had already received $50,000. But the payback was to the mother for the attorneys. Even when the court was considering the attorneys' concept, the trial court actually said each party can pay their own. Because the most complex issue in this matter was the business valuation. Which the court is actually correct. Which is kind of another indication that that business valuation is beyond, I think, what the attorneys could consider or understand, frankly. And the court did rely on valuations for that purpose. Which is also part of the court's consideration of the attorney's fees as well. Let me just ask a question about how the attorney's fees were submitted. Because there was this detailed billing statement submitted by her attorney at trial. And was there any kind of stipulation about attorney's fees at all, about the reasonableness of hourly rate or anything like that? No, there wasn't. And was there any evidence presented about what a reasonable hourly rate is in Marion County and that sort of thing? No, there wasn't. We had that discussion on the very last day of trial about how that works out. The concept is to submit your attorney's fees and then you can go back to hearing afterwards for that exact answer. And, oh, that's correct. That was never done. They're only appearing in the judge's, the judge. So that process did not occur. All right. Thank you, Mr. Karnak. Mr. Beaver. Thank you, Governor. Judge, it's the Exhibit UU was the bill. And I didn't see any discussion about the hourly rate. And I cited a case that suggested that the court's going to criticize the hourly rate being submitted that the court should conduct a hearing on that, and that was never done. Well, what I heard Mr. Karnak say was that it was contemplated that there would be such a hearing later. I'm talking about the issue of attorney's fees. Yeah, I am, too. I don't think there was any discussion of that that I thought occurred. I mean, that's what I'm getting at. I mean, if both sides thought that, you know, there could be, they could present evidence of the reasonableness of their fees later and that it just got decided without that hearing, I would set forth a record on that. I don't think there's anything in the record that suggests that. Okay. The health of Julie that the court didn't consider, and we cited a case in our reply brief that, the Brunson case. And it says the record also demonstrates that the court unruly discounted Barbara's likely long-term health care expenses and overestimated her ability to earn salary income. And here, Julie testified that she'd been hospitalized four or five times while these proceedings were pending. Now, I understand people have asthma and depression and they work. But I also understand that people that have COPD are debilitated and they don't work and they can't work and they become hospitalized under stress and that kind of thing. And that testimony was not rebutted by Bernard. This argument about the payment of the tele-evangelist was something like $50 a month. She did tithe. She testified she tithed, and she testified that that was the practice of the parties during a marriage. So are we supposed to change our lifestyle because of the divorce? Which, of course, Bernard's not going to have to, but Julie's going to have to if we don't get a fair result on this maintenance issue. This 737 license, right, whatever the number is, she can get one, but she's got to get a sponsor. And no one ever sponsored her. She testified to that, that she had to have a sponsor before she could apply for the license. I don't believe she had an associate's degree. I know that she started college and quit because she became pregnant with the party's first child. She tried to go back later, my recollection is, and this is clearly set forth in the facts, but later and couldn't do it because they didn't have a nursery for the children. And so then she engages in assisting Bernard in growing this financial planning business. She testified there was times that she'd sleep in the office because there was so much things that she was doing. There were times when she'd take her young child, they had a bassinet or something like that there, and care for the child in both to help develop the business, help her husband, and also to bond with the potential customers and clients. And the court didn't seem to care about this marital partnership that these parties had for 29 years when he made this paltry reward of maintenance. In his brief, Bernard supports, cites a couple of cases on the maintenance issue. They're both readily distinguishable. In the one he reminded on chiefly, there the pay for a wage earner had a minor child he was supporting, and his financial affidavit indicated he didn't have enough money to pay maintenance. Of course, here we've got a totally different situation. There's no minor child. The youngest child's graduated from college. He's got at least $2,000 by his own financial affidavit to pay maintenance. He's got another $2,000 at least as a result of his son graduating from college. Totally different situation than the cases that were cited in Bernard's brief. The idea that just because Julie borrowed money from her mother and sister to pay her attorney's fees, we should just ignore that. Young people are people without income. That's how they get their money is from their family to fund the litigation that became necessary here. So as I see this case, we're asking for a new trial. We cited the authority for why there's just an accumulation of error in my view of it. Some of the cases we cited in the reply, they did take and say, Well, we're going to award maintenance and adjusted duration in a month. If this court thinks it has enough of a record to do that, that would be great. They also revalued the business based on the record in one of the cases. So I suppose the court could cut through it all and do justice between the parties by valuing and allocating property. Thank you. All right. Thank you both for your briefs and your arguments. We'll take this matter under advisement and issue a decision in due course.